JOHN McKENZIE, PETITIONER-RESPONDENT, v. BRIXITE MANUFACTURING CO., RESPONDENT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 16, 1960—Decided May 24, 1960.

Sullivan, J. A. D., dissented.

464

Before Judges PRICE, SULLIVAN and FOLEY.

*Mr. Fred Feinberg* argued the cause for petitioner-respondent (*Mr. Solomon B. Borsky,* attorney).

*Mr. Isidor Kalisch* argued the cause for respondent-appellant.

The opinion of the court was delivered by

FOLEY, J. A. D. Petitioner was awarded a judgment in the Workmen's Compensation Division which was affirmed by the County Court. Respondent appeals.

McKenzie was employed by the respondent as a "granule mixer." He testified that on May 14, 1957, as he was passing a fellow employee, Walter Johnson, who was engaged in scraping hot asphalt from a bucket, he touched Johnson on the shoulder whereupon Johnson turned about and struck him on the right forearm with the result that the hot scraper burned him. The version of the affair offered by respondent was quite different. Johnson testified as follows:

"Q. Do you remember a happening involving yourself and Mr. John McKenzie? A. I beg your pardon?

Q. Do you remember something happening this day between yourself and Mr. John McKenzie? A. Well, there was no kind of words or nothing.

The Deputy Director: Do you remember this happening?

The Witness: Yes, I remember.

Q. Will you please tell us about it?

The Deputy Director: What happened?

The Witness: I don't know exactly what date it was on or not. But at the time we were working, and I went and got a bucket of asphalt. I had poured the asphalt in the tank, and Mr. McKenzie came by—

Mr. Feinberg: Who?

The Witness: Mr. McKenzie; John McKenzie; and as I was scraping the bucket out of the asphalt, he came by and goosed me.

And I swung around with the scraper and hit it on his hand.

Q. Did he touch you on the shoulder, Mr. Johnson? A. No, not on the shoulder. I don't know nothing about it.

The Deputy Director: Stand up and show me exactly where he goosed you?

The Witness: Right here (indicating).

The Deputy Director: Turn around. I can't see it from there. Show me where?

The Witness: Right here (indicating).

The Deputy Director: He now points to the mid-buttock area, where the anus is located."

John Miller, another employee, testified:

"Q. Mr. Miller, do you remember the incident occurring on approximately May 14th, 1957 involving Mr. Johnson and Mr. McKenzie? A. Say that again, please?

Q. Do you remember something happening involving Mr. McKenzie and Mr. Johnson in about May of 1957; May 14th? A. No, I don't.

Q. Do you remember when Mr. McKenzie was burned on the arm. A. Yes.

Mr. Feinberg: I object, if your Honor please.

The Deputy Director: Well, that has been testified to. I will allow it.

Q. Would you please tell us what happened? A. Well, the way I seen it, they was running a corner line, so Mr. Johnson went and got a bucket of asphalt, and that asphalt is hot. He got the asphalt and brought it back, poured the asphalt in the tank.

When he emptied the bucket, there was some left in the bucket, and he was scraping it out, and as Mr. Johnson was bent over scraping out the bucket, this Mr. McKenzie walked up behind him and goosed him; and Walter just throwed his arm around and hit him with the hot asphalt. I saw all that."

Robert Schaab, assistant plant superintendent, testified:

"Q. Did Mr. McKenzie tell you himself what had happened at that time? A. After he came back to work. This was after he had been released by the Doctor.

Q. Yes. A. (Continuing) He told me that in passing by Walter Johnson he had touched him. And knowing Johnson and McKenzie I—

Q. No, no. You can only testify to what he told you. A. I see. Well, I asked John McKenzie whether, instead of touching him, whether he had actually goosed Mr. Johnson, and he said, 'yes.'

Q. He admitted that to you? A. Yes.

�લ    �લ    ✛    ✛    ✛    ✛    ✛    ✛

The Deputy Director: Exactly what did you ask him? What was the language you used?

The Witness: Well, this is quite some time ago, but—

Q. As near as you can remember. A. Well, very likely I said, 'John, are you sure you were not kibitzing around? Are you sure you just touched him passing by, or did you goose him?

That is very likely what I would have said.

Mr. Feinberg: All right.

The Witness: And at that time he admitted that he had goosed him."

Both lower tribunals found as a fact that the incident was as described by Johnson and Miller and our independent examination of the record leads us to the same conclusion. We are also satisfied from the testimony of Johnson and Schaab that the sportive act involved was a common practice in various parts of the plant and that many employees participated in it from time to time. Moreover, we are

convinced that the management was aware of the existence of the practice and took no measures to terminate it. However, there was no evidence that this activity was ever indulged in at the particular place of the happening here involved or at any other place in the plant where the type of work performed or the materials used by the employees were likely to endanger the safety of either a victim or an instigator of the skylarking described. The only testimony bearing on this subject came from Schaab:

> "Q. Now, you say, 'knowing Mr. McKenzie and Mr. Johnson'; what did you mean by that? A. Well, they are equally ticklish and goosy, and it is something that unfortunately you can't stop. They goose back and forth.
> Q. In other words, there is quite a lot of goosing going on back and forth; is that right? A. Well, they spend their time working. It is my job to see that they put in a day's work.
> They don't spend eight hours a day goosing one another.
> Q. But occasionally they would? A. They would.
> Q. And you tolerate that as part of the normal manner of people engaging in work? A. It happens all over, I'm afraid.
> Q. And you knew that this was happening; is that correct? A. That's right.
> Q. Now, sir— A. (Continuing) I will say this: Whenever we run this corner operation, Walter Johnson works that same spot. He works at a large storage tank; a thirty-five hundred gallon storage tank, and draws a bucket of hot asphalt. Every man on the job knows that Walter Johnson is goosy; but when he is playing with a bucket of hot asphalt they stay far away from him."

Initially it is argued that the petitioner's claim is barred by the provisions of *N. J. S. A.* 34:15–7.1, *L.* 1956, *c.* 141, *p.* 579, § 9, which reads:

> "An accident to an employee causing his injury or death, suffered while engaged in his employment but resulting from horseplay or skylarking on the part of a fellow employee, not instigated or taken part in by the employee who suffers the accident, shall be construed to have arisen out of and in the course of the employment of such employee and shall be compensable under the act hereby supplemented accordingly."

In support of this contention respondent maintains that the granting of compensation for injuries suffered by a non-

participant in skylarking evinces an intention of the Legislature to debar instigators or participants in skylarking from the benefits of the Workmen's Compensation Act in *all* such cases. We cannot agree. The fact that the act is remedial social legislation to be construed liberally is so well recognized as to require no citation of authority. From the time of its adoption the legislative policy consistently has been to broaden rather than to restrict the coverage of the act; and the flow of judicial interpretation of the act has ever been in the same direction. Thus an intent to exclude a class of persons from its coverage unless explicitly stated should not be assumed. The plain wording of the statute, as above set forth, emphasizes an intent to rectify the injustice of withholding compensation from the innocent victim of the sportive act of another (as was the case in *Hulley v. Moosbrugger*, 88 *N. J. L.* 161 (*E. & A.* 1915)), whether or not such act was a part of a common practice of which the employer knew or should have known. See *Budrevie v. Wright Aeronautical Corp.*, 135 *N. J. L.* 46 (*Sup. Ct.* 1946), affirmed 136 *N. J. L.* 198 (*E. & A.* 1947). Although the Supreme Court, in citing these cases in *Secor v. Penn Service Garage*, 19 *N. J.* 315, 320 (1955), observed that the "great weight of authority is now to the contrary" of these holdings, the cases had nonetheless not been repudiated at the time *L.* 1956, *c.* 141, § 9, was adopted. Hence it is evident that it was this state of the law which the Legislature desired to change. But it does not follow that the Legislature intended also to foreclose a participant in skylarking from any rights he might be found to have in the light of the facts of his particular case. We think, therefore, that the failure to include the instigator or participant within the amnesty granted by *L.* 1956, *c.* 141, § 9, is indicative of a legislative intention that such persons were to be left *in statu quo*, neither gaining nor losing by this legislative supplement. However, it cannot be denied that the enactment displays a legislative policy of distinguishing between victim and participant in or instigator of skylarking by placing the

rights of the victim on a footing separate and apart from that occupied by the participant or instigator.

In both the Division and the County Court reliance was placed on the holdings in *Martin v. Snuffy's Steak House,* 46 *N. J. Super.* 425 (*App. Div.* 1957), and *Secor v. Penn Service Garage, supra,* as authority for the decisions therein reached.

In the *Martin* case petitioner, a waitress, was in verbal disagreement with respondent's chef *over the performance of their respective duties.* In the course of the dispute thus generated, the chef abused petitioner by the use of loud, profane and indecent language. Her patience exhausted, petitioner slapped or attempted to slap her tormentor's face. He retaliated by hitting her with such force that she was thrown against the kitchen refrigerator, her back striking the protruding door handle thereof. The holding in the case was that since the dispute between the employees concerned the performance of their respective duties it "arose out of the employment" within the purview of the statute. Respondent's contention that petitioner was the aggressor in the culminating physical violence, and so not entitled to a recovery, was brushed aside by the court with the observation that the act of the petitioner in slapping or attempting to slap the chef's face was "simply a reflex action" such as might reasonably be expected of a woman attempting to halt a flow of offensive language directed toward her. 46 *N. J. Super.,* at *pages* 432–433. The patent distinction between *Martin* and the case *sub judice* lies in the fact that in *Martin* the assault arose out of service to the master and occurred in the course of the performance of the same. In the case at bar McKenzie's act was completely unconnected with the duties he owed to his employer and was entirely the product of his own caprice. In what must be considered *dicta* the court discussed the "aggressor rule," 46 *N. J. Super.,* at *pages* 433–442, and in so doing observed that it did "not consider that the Legislature meant to punish a workman for a playful shove, an angry curse, or even an impulsive

slap or punch, by depriving him of compensation." *Id.,* at *page* 441. The passing reference to the "playful shove" is now made the basis for the argument that the assault cases and those involving skylarking stand on precisely the same footing in the eyes of the law; and the emphasis laid on the *Martin* case by the Division and the County Court in the instant case strongly suggests that this view was shared by those tribunals. We think otherwise. Professor Larson draws the distinction between the two classes of cases with telling effect:

"While assaults and horseplay have some features in common, they also have some differences which make it doubtful whether the reasoning of assault cases can be taken over bodily and applied to horseplay. This reasoning pictures the day-to-day enforced contact of divergent personalities under the strains of industrial life, with the not improbable culmination in flare-ups of ·temper as the direct result of this environment. There is something relentless and inescapable about the emotional explosion that is thus ultimately thrust upon the claimant 'aggressor' virtually against his will. But in a horseplay case, the most you can say is that the employment environment provides temptation and opportunity, rather than implacable emotional pressure. Hence, when a prankster sets out to play a practical joke, there is a higher probability that the action may amount to a deliberate and conscious deviation from employment than in the assault cases, in which almost every instance of violence is a spontaneous and unpremeditated reaction to the play of the surroundings on the claimant's temperament." 1 *Larson, Workmen's Compensation Law,* § 23.50, *p.* 354 (1952).

Nor do we find the *Secor* case to be controlling. There the duties of the petitioner included the dispensing of gasoline. While filling the gas tank of a customer's automobile the gasoline overflowed and splashed on petitioner's right sleeve and left trouser leg. A superior observed the happening and asked petitioner to change his clothing, remarking that it was dangerous to have gasoline on his clothes. Petitioner went into the office to do so and while either (1) lighting a cigarette, (2) attempting to convince the superior that the change was unnecessary, or (3) in a spirit of bravado, lit a match and held it close to his left leg

with his right hand. The gasoline exploded and he suffered severe burns. In affirming an award in petitioner's favor the court took pains to emphasize that the presence of gasoline on the clothing was attributable to his work and was a contributing cause of the injury. 19 *N. J.*, at *page* 319, and again at *page* 323. The court cited *Sanders v. Jarka Corp.*, 1 *N. J.* 36 (1948), in which it was held that the employment "need not be the sole or proximate cause of the injury" and that the statutory requirement is met if the employment is "a contributing cause to the accident" or "a necessary factor" leading to it. We deem the rationale of *Secor* to be that the work-connected contribution to the accident, namely the gasoline on the clothing, furnished a sufficient basis for a recovery; and that the act of the petitioner in lighting the match for any of the enumerated purposes was not a deliberate and conscious excursion from his duties but was a "momentary or impulsive act" which caused the work-induced contributing condition to result in injury to the petitioner. Following the reasoning of *Secor,* and even assuming for the purpose of argument that McKenzie's touching of Johnson was merely a "momentary or impulsive act" and a minor deviation from the course of the employment, the record is devoid of evidence that the act in question bore even the slightest relationship to any factor which can be said to have been an incident of the employment. Moreover, when we consider, as we must, that this particular skylarking activity was routine for McKenzie, the conclusion is inescapable that what he did was a purely personal act. Thus the radical factual distinctions between the case at bar and *Secor* render the latter inapposite to the problem here presented.

Petitioner strenuously contends that the prevalence of the particular sportive act priorly participated in by McKenzie and other employees with the employer's knowledge caused it to become an "incident of the employment" so as to charge the employer with responsibility for the injury arising therefrom.

We have no doubt that an employer by mere acquiescence in the custom or practice of employees' engaging in activities which, while not work-connected, may subject them or their fellow employees to a risk to which they would not otherwise be exposed, may become responsible for such a risk as an incident of the employment. We recently so held in *Yurochko v. Beckley*, 61 *N. J. Super.* 1 (*App. Div.* 1960), wherein an employer permitted his employees to use dangerous machinery to fashion the employer's scrap materials for their own use and an employee while so engaged was injured. And it is understandable that an employer who acquiesces in his employees' sportively throwing gasoline used in the work operations upon each other should be held responsible for the resulting injuries, as is suggested in *Staubach v. Cities Service Oil Co.*, 126 *N. J. L.* 479 (*Sup. Ct.* 1941), *certiorari* denied 127 *N. J. L.* 577 (*Sup. Ct.* 1942), affirmed 130 *N. J. L.* 157 (*E. & A.* 1943). Nor do we question the wisdom of holding the employer liable where an employee is struck in the eye by a missile playfully thrown by a fellow employee who is known by the employer to be a habitual perpetrator and prankster of various acts of horseplay directed at anyone who might come within his reach. *Greene v. Watson Flagg Mach. Co.*, 25 *N. J. Misc.* 146, 147–148 (*Dept. Labor* 1947).

But in each of these cases the claimant was an innocent victim of a co-employee's prank. No case has been reported in the appellate courts of this jurisdiction in which a participant in, or instigator of, skylarking has been allowed a recovery, nor has the concept that recovery may be posited upon the existence of a common practice of skylarking with the knowledge and acquiescence of the employer, as is suggested in *Budrevie v. Wright Aeronautical Corp.*, *supra*, been stated in a case in which the claimant was either instigator or participant. The authorities in other jurisdictions are in marked conflict on this subject and the text writers are in disaccord in their treatment of the matter. Horovitz holds strongly to the thesis that:

"The more recent and better rule is to allow an award for an injury resulting from horseplay, even to aggressors, where the injury is a by-product of associating men in close contacts, thus realistically recognizing the 'strains and fatigue from human and mechanical impacts.' "

Horovitz, *"Current Minds in Basic Principles of Workmen's Compensation,"* 3 *NACCA L. J.* 58 (1949). But Larson observes that:

"there is very little authority in decided cases for the application of this broad rule to horseplay situations, as distinguished from malicious assault cases, which Horovitz groups with horseplay cases for purposes of his attack on the 'aggressor' defense. The cases cited as supporting such a rule can be accounted for on the basis of the 'custom' rule * * * or on the basis of special facts which make them fall short of straight 'aggressor' cases."

*Larson, Workmen's Compensation Law,* § 23.50, *p.* 352 (1952). And Larson holds that there is a "very real distinction between non-participation and voluntary participation in some [skylarking] cases." *Id.*, § 23.61, *p.* 356. He suggests that where as here coverage is granted to non-participants, the right of recovery by participants or instigators should be determined on a "course of employment" basis, the facts in each case to be examined for determination of whether the sportive act in question constituted a substantial deviation from the course of the employment. However, the authorities cited for this proposition do not relate to horseplay cases but deal with deviations generally. *Id.*, § 19.63.

Since, as we have noted, the Legislature in adopting *L.* 1956, *c.* 141, placed skylarking situations in a special category, decisional law should give recognition to the policy which this chapter reflects. While the statute did not outlaw all claims of participants in, or instigators of, skylarking, implicit in it is a legislative disfavor of the instigating or participating claimant in a general sense. With this in mind we think that the burden rests firmly *on such a claimant* to establish by a preponderance of probabilities that the act of skylarking, considering the nature of it, and

the time and place of its occurrence, was not such as could be said to be a consequential deviation from the course of the employment.

In the case *sub judice* petitioner did not affirmatively accept this burden in the presentation of his claim. Indeed, he portrayed the incident as an innocent tap on the shoulder as he passed by Johnson, a greeting perhaps, or a friendly gesture. Had this been so we would have no hesitancy in affirming this award since clearly the act then would not have been reflective of an intent on McKenzie's part to depart from the course of his employment. But such was not the case. His was a mischievous act purposely committed with the intention of molesting Johnson, whose sensitivity to what was done was known to McKenzie. Moreover, it was a part of a continuous pattern of the same conduct toward Johnson and viewed in this perspective may be said to be a significant departure from the course of McKenzie's employment, particularly because it was committed with full knowledge that it was disruptive of work duties of both his victim and himself. At the very least it was petitioner's obligation to prove that the employer had countenanced a common practice of which the particular act was a part at a place in the plant and under circumstances such as were then present. The petitioner was content to rely on fragmentary proof developed on cross-examination that similar playful activities occurred in various undescribed parts of the plant at various unnamed times, and made no effort whatever to countervail respondent's testimony that when Johnson was working with hot asphalt his fellow employees put the place where he worked in "quarantine."

We, therefore, conclude the proofs failed to establish that petitioner's injuries were sustained "in the course of" his employment. Rather we find that they were the result of an act which was completely unconnected with his duties and entirely personal to him.

Reversed.

SULLIVAN, J. A. D. (dissenting). I am in complete agreement with the rule of law set forth in the majority opinion, but I do not subscribe to the determination that the facts of this case establish a substantial deviation from the course of the employment.

The incident clearly was a mishap, and while it may have resulted from the exercise of some raffish humor on petitioner's part, considering the environment of the particular employment, including the fact that this type of horseplay was frequently indulged in by the employees to the knowledge of the employer, I think that the particular act was momentary, impulsive, and an inconsequential deviation from the course of petitioner's work.

"An employee is not an automaton, and, even when he is highly efficient, he will to some extent deviate from the uninterrupted performance of his work. Such deviation, if it be considered minor in the light of the particular time, place and circumstance, is realistically viewed by both the employer and the employee as a normal incidence of the employment relation and ought not in this day be viewed as legally breaching the course thereof." *Secor v. Penn Service Garage*, 19 *N. J.* 315, 324 (1955).

I would rule that petitioner's injuries resulted from an accident arising out of and in the course of his employment.